**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| LOUISIANA MUNICIPAL POLICE | ) | |
|   EMPLOYEES' RETIREMENT SYSTEM, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. CIV-12-667-D |
| | ) | |
| CONTINENTAL RESOURCES, INC., | ) | |
|   HAROLD G. HAMM, H. R. SANDERS, JR., | ) | |
|   JOHN T. McNABB II, MARK E. MONROE, | ) | |
|   ELLIS L. McCAIN,  ROBERT J. GRANT, | ) | |
|   JEFFREY B. HUME, and WHEATLAND | ) | |
|   OIL INC., | ) | |
| | ) | |
|     Defendants. | ) | |

**ORDER**

Before the Court is the Plaintiff's Motion for a Preliminary Injunction [Doc. No. 51].  The

defendants timely filed objections to the motion.  On August 8, 2012, the Court conducted a hearing

at which all parties appeared by counsel.

The preliminary injunction motion was filed on July 30, 2012, shortly before the Court

conducted a hearing on Plaintiff's motion for a temporary restraining order ("TRO").[1]  On August

3, 2012, the Court filed its Order [Doc. No. 62] denying the motion for a TRO, setting a briefing

deadline for the defendants' responses to the preliminary injunction motion, and scheduling the

motion for hearing on August 8.

---

[1]All parties had been served with summons and the Complaint prior to the filing of the TRO motion,
and all appeared by counsel at the July 30 hearing.  Defendants assert that Plaintiff's delay in pursuing a TRO
and preliminary injunction is an adequate basis to deny relief, noting the lawsuit was filed on June 12, 2012.
The Court is puzzled by Plaintiff's delay, and that timing did affect the  Court's consideration of Plaintiff's
requests for expedited discovery; however, having reached the merits of Plaintiff's previous TRO motion,
the Court likewise will address the merits of the request for a preliminary injunction.

Both the motion for a TRO and for a preliminary injunction ask the Court to enjoin the August 10, 2012 vote of the shareholders of Defendant Continental Resources, Inc. ("Continental"). The purpose of the August 10 vote is to determine whether the shareholders will approve a proposed acquisition by Continental of certain assets owned by Defendant Wheatland Oil, Inc. ("Wheatland"). Plaintiff, a Continental shareholder, asks the Court to enjoin the vote, arguing the July 9, 2012 definitive proxy statement ("Proxy") omits material facts which render it misleading to the minority shareholders.  If the August 10 vote is not enjoined,  Plaintiff asks the Court to enjoin Defendants from counting the shares voted by the trustee of two trusts ("Trusts") established for the benefit of the children of Defendant Harold Hamm ("Hamm"); Hamm is the Chief Executive Officer ("CEO") and majority shareholder of Continental.

Having reviewed the parties briefs and arguments and the evidence presented in light of the governing law, the Court finds that the motion for a preliminary injunction must be denied because Plaintiff has failed to establish the requisite elements to warrant an injunction.

I.  Facts established by the record:

A. Background:

Plaintiff filed this action on June 12, 2012, alleging, *inter alia,* that the defendants have breached their fiduciary duties to minority shareholders in connection with Continental's proposed acquisition of certain Wheatland assets for a price of approximately $340 million to be purchased with Continental stock.  Plaintiff alleges that the transaction is designed to benefit Hamm and Defendant Jeffrey B. Hume ("Hume") to the detriment of Continental shareholders.  Plaintiff also contends the proxy materials filed as of the date of the lawsuit[2] omit disclosures which are material

---

[2]At the time the lawsuit was filed, the definitive Proxy had not yet been filed, and Plaintiff's allegations regarding material omissions referred to the several preliminary proxies which were filed prior
(continued...)

to the minority shareholders' ability to cast an informed vote on the proposed acquisition of the Wheatland assets.  Plaintiff also contends that shares held by the two irrevocable Trusts should not be counted as minority shares, but must instead be treated as owned or controlled by Hamm.

In addition to his status as CEO of Continental, Defendant Hamm owns approximately 68 per cent of Continental's stock.  Wheatland is owned by Hamm and Hume, who is also Continental's Vice Chairman of Strategic Growth Initiatives and its former President and Chief Operating Officer. Hamm owns 75 per cent of Wheatland, and Hume owns 25 percent.  The assets to be purchased in the proposed sale consist of Wheatland's five to ten per cent interests in oil and gas properties located in portions of the Bakken field in North Dakota and Montana and other properties in Oklahoma and Mississippi.  The proposed transaction is not an acquisition of the stock of Wheatland, but is a purchase of Wheatland assets consisting of all its interests in the above-described oil and gas properties, the majority of which are currently owned by Continental (the "Assets").

Plaintiff is a Louisiana public retirement system which has invested in Continental stock, and currently owns shares which it values as worth more than $75,000.00.[3]  Continental is an oil and gas exploration and production company, and its stock is publicly traded on the New York Stock Exchange ("NYSE").  Pursuant to the terms of the purchase and sale agreement between Continental and Wheatland, the proposed acquisition is an interested party transaction requiring the approval of a majority of Continental's minority shareholders, including Plaintiff.  In effect, this means that Continental must receive approval from a majority of the issued and outstanding Continental shares

---

[2](...continued)
to the June 12 lawsuit. Plaintiff's motions for a TRO and for a preliminary injunction challenge the July 9 definitive Proxy.

[3]The number of Continental shares owned by Plaintiff is not disclosed in the Complaint or the motion.

held by shareholders other than members of Continental's Board of Directors, its executive officers, Hamm and his affiliates, and Hume and his affiliates.

In support of its motion to enjoin the August 10 vote, Plaintiff asserts two general arguments: 1) that the July 9, 2012 definitive proxy statement omits material information which renders the proxy misleading to the shareholders; and 2) that the shares owned by irrevocable trusts for the benefit of Hamm's children (the "Trusts") should be excluded from the vote because Hamm effectively controls the trustees' vote and/or the Trusts should be regarded as insiders whose votes should be excluded because they are effectively affiliates of Hamm.

The material omission claim was the only argument asserted in support of Plaintiff's TRO motion.   At the hearing on the TRO, Plaintiff's counsel stated that, although the issue of the Trusts was raised in its motion seeking a TRO, it would not pursue that issue at the hearing and would instead rely on the material omission claim. In denying the TRO, the Court found that Plaintiff had failed to satisfy the burden required to warrant the extraordinary remedy of a TRO based on its contention that the Proxy statement omitted material facts.   In an August 3 Order [Doc. No. 63], the Court granted Plaintiff's request to depose the trustee(s) of the Trusts prior to a hearing on the preliminary injunction.   On August 6, 2012, Plaintiff took the deposition of Bert Mackie ("Mackie"), who is co-trustee of the Trusts.

On August 8, 2012, the Court conducted the hearing on the preliminary injunction motion, and heard additional argument and received evidence presented by the parties.

B.  The proposed acquisition:

On July 9, 2012, Continental issued a definitive proxy statement to its shareholders in which it presented the proposal for a shareholder vote to be conducted on August 10, 2012.  A copy of the July 9, 2012 proxy statement ("Proxy") is submitted as Exhibit 3 to Plaintiff's preliminary injunction

4

motion and as Exhibit 3 to Continental's response brief.  The background leading up to the proposed acquisition of the Assets is explained in detail in the Proxy.  Although that background need not be repeated in this Order, a summary is important to understanding the transaction and the nature of Plaintiff's claims.

In November of 2010, Wheatland asked Continental if it would be interested in purchasing the Assets.  At that time, Continental was interested in adding to its ownership of properties in the Bakken field, which had been highly successful.  Continental has been involved in oil and gas exploration in the Bakken field for some time.  By 2010, it had the largest drilling program in the Bakken Shale in North Dakota and Montana.  Continental 2010 Annual Report, Continental hearing Exhibit 1, at pp. 1, 10–11.  As explained in the 2010 Annual Report, the positive results from development of the Bakken field led Continental to pursue acquisition of additional interests in the Bakken field.  *Id.*   Through a 2002 participation agreement with Continental, Wheatland also invested in properties located there, including the Assets.  Proxy, p. 22.

In November of 2011, Continental's Board of Directors voted to consider Wheatland's proposal,[4] and it created a special committee, composed of members of Continental's Audit Committee, to determine whether to pursue the transaction and, if so, to negotiate an agreement. Defendants H.R. Sanders, Jr., John T. McNabb II, Mark E. Monroe, Ellis L. McCain, and Robert J. Grant were the members of this committee (the "Special Committee").  To assist it in carrying out its responsibilities, the Special Committee retained a law firm, Weil, Gotshal & Manges ("Weil"), and a financial advisor, Evercore Group, L.L.C. ("Evercore").

On February 3, 2012, Hume offered to sell the Wheatland Assets to Continental for $385 million in Continental's common stock or a higher price in cash.  At the time, Wheatland valued

---

[4]It is not disputed that Hamm abstained from this vote by Continental's Board of Directors.

the Assets at $350 million to $425 million. As explained in detail at pages 24 through 29 of the Proxy, the Special Committee conducted numerous meetings in February and March of 2012, and it engaged in negotiations with Hume regarding the details of a potential purchase of the Assets. Evercore conducted an analysis to determine the fairness to Continental of the proposal, and the Special Committee met with Evercore several times to discuss the details of the prospective acquisition. The Special Committee also received information provided by Wheatland's financial advisor, RBC Capital Markets, LLC ("RBC"). The Proxy explains in detail the Special Committee's separate communications with Weil, Evercore, and RBC, as well as the topics discussed. Proxy, pp. 24-28. Additionally, the Proxy explains that the Special Committee met with Evercore several times to review financial data regarding Wheatland, including valuation of the Assets, anticipated future expenditures, and reserve data. *Id.* at p. 26. The Proxy explains the factors considered by the Special Committee in evaluating the proposed transaction and a potential purchase price. *Id.*

Also explained in the Proxy is the fairness opinion issued by Evercore, and a copy of its opinion is attached as Appendix A to the Proxy. The Proxy sets out the bases for Evercore's valuation of the net assets of Wheatland, including the actions taken by Evercore in performing its analysis. Proxy, at pp. 31-38.

Included in the Proxy is a description of Wheatland and its assets, including a description of the developed and undeveloped acreage owned, the proved reserves and proved wells and locations, and production data for wells included in the Assets. Proxy, pp. 14-15. Also included are tables showing production quantities for the previous three calendar years and revenues and costs for those years. *Id.* at p. 15.

The Proxy reports that, after a series of discussions and negotiations, the Special Committee agreed on March 26, 2012 to submit for Board and, ultimately, shareholder approval, a proposed

transaction which authorized a purchase and sale agreement whereby Continental would purchase the Assets for a price of $340 million to be paid with shares of Continental stock. Proxy, p. 29 and pp. A-1 through A-3. On March 27, 2012, the Special Committee presented its recommendation to the disinterested Continental Board members. The Board approved the agreement on that date, and authorized its submission to a vote of the minority shareholders for approval. *Id.*

The proposed transaction was announced by Continental in a March 28, 2012 press release. On April 3, 2012 Continental filed its first Preliminary Proxy disclosing the details of the transaction, and it publicly filed with the SEC revised preliminary proxies on May 8, 2012 and on June 4, 2012. The SEC reviewed and cleared both the initial and final (definitive) proxy.

On July 9, 2012, Continental filed the Proxy, which constitutes the definitive proxy statement and recommends approval by the shareholders of the proposed acquisition of the Assets. The Proxy schedules the shareholder vote for August 10, 2012.

According to Plaintiff, after the prospective transaction was announced in March, it contacted Continental to request additional  information regarding the transaction. Continental declined to provide additional information. Plaintiff's counsel stated during previous oral argument on the TRO motion that Plaintiff requested information on subsequent occasions, but did not receive the information. This is contested by Continental.

On May 17, 2012, Reuters News Service published an article reporting that Occidental Petroleum is moving rigs out of the Bakken shale oil fields, citing escalating labor costs in North Dakota as well as additional increases in the costs of well production in 2012. Plaintiff's Ex. 2 . The article also reported that Occidental did not intend to fully move out of the Bakken, quoting its CEO as stating the company would remain active there because "that's where the oil is." *Id.* at p. 2.

Following the publication of the Proxy, two independent ratings companies, Glass, Lewis & Co. and ISS Proxy Advisory Services, analyzed the Proxy and recommended the shareholders approve the transaction.  Continental Exs. 4-6.  According to Glass, Lewis & Co., the acquisition appears "to be priced fairly for, if not in favor of, Continental shareholders."  Continental Ex. 4, at p. 7.

C.  The Trusts:

The Proxy discloses that the Trusts will be included among the minority shares counted in the proposed vote because the Trusts are not controlled by Hamm or any affiliate of Hamm.  As disclosed in the Proxy, the Trusts are two irrevocable trusts established for the benefit of Hamm's children.  Proxy, p. 39.  Mr. Mackie and Jane Elizabeth Hamm are co-trustees of one irrevocable trust, while Mr. Mackie and H. Thomas Hamm are co-trustees of the second irrevocable trust.  As of June 29, 2012, the Trusts held 14,687,501 shares of Continental's common stock, representing approximately 8.11% of the issued and outstanding shares of common stock on that date.  *Id.*  The Proxy explains that "Hamm does not possess any voting or investment power with respect to" the shares in the Trusts.  Proxy, p. 39.  It further states "the trustees will vote the shares of Common Stock held in the irrevocable trusts for the benefit of the children of Mr. Hamm as they determine appropriate in accordance with the terms of the relevant trust agreements."  *Id.*  It is not disputed that the shares held by the Trusts make up 25 percent of the total minority ownership of Continental.

Mackie testified in his deposition that, as co-trustee of the Trusts, he manages the investments controlled by the Trusts.  Mackie deposition, Ex. 2 to Continental brief, p. 23, lines 15-18.  He also testified that Hamm has never told him how to vote the Trusts' shares.  *Id.*, p. 26.  Although he previously served as personal asset manager for Hamm until September of 2011, he currently has no affiliation with any entity owned or controlled by Hamm.  *Id.,* p. 19.  Mackie has

8

not discussed the Wheatland Asset acquisition with Hamm or Hume, and his only contact with any Continental board member regarding the acquisition was a telephone call from Defendant Monroe, Chairman of the Special Committee.  According to Mackie, Monroe asked if Mackie, as co-trustee of the Trusts, was independent of Hamm; Mackie "told him I was completely independent" and had not discussed  the Wheatland transaction with Hamm at any time.  Mackie dep., p. 30, lines 16-25; p. 31, lines 1-5. Mackie testified that, as a trustee, he always votes in the best interest of the Trusts. If that interest should ever conflict with Hamm's interests, "then my allegiance and my focus is definitely on the trust."  *Id.*, p. 2, lines 18-22.

Mackie also testified that he considers himself a personal friend of Hamm, and he regards Hume as a friend, and he knows Monroe.  Mackie does not do business with any Continental board members.  Mackie dep., p. 32, lines 2-7; lines 24-25; p. 33, lines 1-2.   According to Mackie, he attended no meetings where the proposed acquisition of Wheatland Assets was discussed.  *Id.,* p. 33. He recalls having seen Wheatland financial information in the past.  In connection with the proposed Assets acquisition, however, he did not review any financial material and considered only the information disclosed in the Proxy.  *Id.* , p. 33, lines 22-25; p. 34, lines 1-3; p. 45, lines 16-19.  He reviewed the material in the Proxy reflecting Evercore's opinion, and he independently reviewed Evercore's background and concluded it was a reputable company.  *Id.,* p. 34, lines 9-13.  Mackie testified that, after reviewing the material in the Proxy, he determined that the proposed transaction was a very good investment for the Trusts.  Mackie dep., p.48.  Mackie did not confer with the Hamm children prior to submitting the vote on behalf of the Trusts, and they have not contacted him regarding the proposal.  Nor does he know if they discussed the proposal with Hamm. *Id.,* p. 45, lines 16-25; p. 46, lines 1-7.  Mackie has already submitted the Trusts' vote, via the internet, in favor of the transaction.  Mackie dep., p.41, lines 5-22.

9

II. Analysis and conclusions of law:

A.  Standards governing a preliminary injunction:

To satisfy its burden of proof warranting issuance of a preliminary injunction, the moving party must establish that (1) there is a likelihood that the movant will succeed on the merits of its claim; 2) the movant will suffer irreparable injury unless the injunction issues; (3) the threatened injury...outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest.  *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

"Preliminary injunctions are extraordinary equitable remedies designed to 'preserve the relative positions of the parties until a trial on the merits can be held.'" *Westar Energy, Inc. v. Lake*, 552 F. 3d 1215, 1224 (10th Cir. 2009) (quoting *University of Texas v. Camenisch*, 451 U. S. 390, 395 (1981)).  "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."  *Port City Properties v. Union Pacific R. Co.*, 518 F. 3d 1186, 1190 (10th Cir. 2008).

The Court has considered the evidence, the arguments of counsel, and the applicable law, and concludes as follows with respect to the requisite elements as applied to this case.

1. Likelihood of success on the merits:

To demonstrate a likelihood of success on the merits of its claim, a plaintiff is required "to present 'a prima facie case showing a reasonable probability that [it] will ultimately be entitled to the relief sought.' " *Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*  320 F. 3d 1081, 1100 (10th Cir. 2003) (quoting *Autoskill v. Nat'l Educ. Support Sys.*, 994 F.2d 1476, 1487 (10th Cir.1993)).

The movant is not required to show there is an "absolute certainty" that it will prevail on the merits. *Autoskill*, 994 F. 2d at 1487.  Nor is it required to show an "overwhelming likelihood" of success. *Koerpel v. Heckler*, 797 F. 2d 858, 867 n. 5 (10th Cir. 1986) (citing *Atchison, Topeka, and Santa Fe. Railway Co. v. Lennen*, 640 F. 2d 255, 261 (10th Cir. 1981)).

In certain cases, the Tenth Circuit applies a modified standard for showing a likelihood of success on the merits.  Under the modified standard, if a movant establishes that the other three requirements "tip strongly" in his favor, the movant may satisfy the likelihood of success on the merits element by showing "that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Davis v. Mineta*, 302 F. 3d 1104, 1111 (10th Cir. 2002); *Fed. Lands Legal Consortium ex rel. Robart Estate v. United States*, 195 F. 3d 1190, 1195 (10th Cir. 1999).  The modified test does *not* apply, however, where the requested relief is among the "disfavored" categories of injunctions, including those which: 1) disturb the status quo; 2) are mandatory as opposed to prohibitory; or 3) afford the movant substantially all the relief he may recover at the conclusion of a full trial on the merits.  *See O Centro Espirta Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F. 3d 973, 975 (10th Cir. 2004) (per curiam), *aff'd sub. nom.*, 546 U.S. 418 (2006).  As set forth more fully, *infra,* the Court concludes that the modified standard does not benefit Plaintiff in this case, as the other traditional elements do not "tip strongly" in its favor.

During previous oral argument on the TRO in this case, Plaintiff expressly stated that the only basis for seeking that relief was its contention that the Proxy fails to disclose sufficient facts underlying the opinion of Evercore that the proposed transaction is fair to Continental.  Specifically, Plaintiff argued that the proxy materials fail to sufficiently disclose the basis for Evercore's opinions

regarding the value of the Wheatland reserves and the projected price of the oil and gas that might be realized from the acquisition of the Assets by Continental.   In the TRO Order, the Court concluded that Plaintiff failed to show a likelihood of success on the merits of this claim and, in any event, did not show that it would suffer irreparable harm in the absence of injunctive relief.  The Court further found that the balance of harm did not favor Plaintiff.

During argument at the preliminary injunction hearing, Plaintiff again sought injunctive relief on this same basis.  In support, Plaintiff argues that the Proxy does not show the proposed transaction is fair to the Continental shareholders because the $340 million in stock to be paid by Continental exceeds the Evercore valuation.  Plaintiff also cited purported omissions in the Proxy, specifying the failure to disclose the projected future costs of development of the Assets in the Bakken field.  In particular, Plaintiff contends the Proxy reflects, in the Evercore analysis at pages 14 and 15, that historical costs increased from 2009 through 2011.  Plaintiff contends future costs analysis should be more fully disclosed to the shareholders.    Plaintiff also argues the Proxy is deficient because it fails to disclose the details of the arms-length transactions in which Continental purchased additional properties from other parties.

 Defendants argue, as they did in response to the TRO motion, that Plaintiff cannot show a likelihood of success on the merits because there is no duty to disclose this type of underlying data in a proxy statement and, in any event, the definitive proxy contains detailed information reflecting the bases for Evercore's opinions.

Corporate directors are "'under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action.'" *Globis Partners, L.P. v. Plumtree Software, Inc.,* 2007 WL 4292024, at *10 (Del. Ch. Nov. 30, 2007) (unpublished opinion)

(quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992)).[5]   "'The essential inquiry is whether the alleged omission or misrepresentation is material.'" *Id.* (quoting *Arnold v. Society for Savings Bancorp, Inc.,* 650 A. 2d 1270, 1277 (Del. 1994).  However, the directors' duty to disclose is "not boundless," as "directors need only disclose information that is material." *In re CheckFree Corp. Shareholders Litigation,* 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007) (unpublished opinion) (citing *Louden v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 142 (Del. 1997)).

To constitute a material omission sufficient to establish liability, the information in question must "significantly alter" the "total mix of information made available." *In re Netsmart Techs., Inc. Shareholders Litigation,* 924 A.2d 171, 199 (Del. Ch. 2007); *Zirn v. VLI Corp.,* 621 A.2d 773, 778-79 (Del. 1993).   "The burden of demonstrating a disclosure violation and of establishing the materiality of requested information lies with the plaintiffs." *In re CheckFree*, 2007 WL 3262188, at *2 (citing *In re Gen. Motors (Hughes) Shareholder Litigation,* 2005 WL 1089021, at * 13 (Del. Ch. May 4, 2005), *aff'd* 897 A.2d 162 (Del. 2006)).

In this case, Plaintiff contends that the Proxy omits material information because it fails to disclose the details of the bases for Evercore's fairness opinion, and such omissions render the Proxy misleading.   However, courts have rejected disclosure claims based on the failure to disclose underlying details supporting a fairness opinion. *Skeen v. Jo-Ann Stores, Inc.,* 750 A.2d 1170, 1173 (Del. 2000) (rejecting motion to enjoin a merger based on failure to disclose a summary of the methodologies used and ranges of values generated by the entity issuing a fairness opinion)."[Q]uibbles with a financial advisor's work simply cannot be the basis of a disclosure

---

[5]The parties agree that Oklahoma courts consider decisions of the Delaware courts persuasive authority on issues related to the construction of the Oklahoma General Corporation Act because it is based on Delaware's Corporations Act. *See Beard v. Love,* 173 P.3d 796, 802 (Okla. Civ. App. 2007).

claim." *In re 3Com Shareholders Litigation*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009) (unpublished opinion). "Delaware law does not require disclosure of all the data underlying a fairness opinion such that a shareholder can make an independent determination of value." *Globis*, 2007 WL 4292024, at *13.

"'Omitted facts are not material simply because they might be helpful.'" *Id.*, at *12 (quoting *Skeen*, 750 A.2d at 1174). Thus, a disclosure "that does not include all financial data needed to make an independent determination of fair value is not *per se* misleading or omitting a material fact. The fact that the financial advisors may have considered certain non-disclosed information does not alter this analysis." *Id.* (citing *In re CheckFree*, 2007 WL 3262188, at *2). All that is required regarding a fairness opinion is an "adequate and fair summary" of the work resulting in the opinion. *In re CheckFree,* 2007 WL 3262188, at *3. With respect to the disclosure of details underlying projections for future performance, the Delaware courts have found such projections are not always material. *Id.,* at *3 n. 19 (citing *In re PNB Holding Co. Shareholders Litigation,* 2006 WL 2403999, at *16 (Del. Ch. Aug. 18, 2006) (unpublished opinion)).

Furthermore, where, as here, the proxy material provided to shareholders has been submitted to the SEC and approved, that decision is entitled to "some weight." *Deborah G. Mallow IRA Sep Investment Plan v. McClendon,* 2012 WL 2036748, at *3 (W.D. Okla. June 6, 2012) (unpublished opinion) (citing *McConnell v. Lucht,* 320 F.Supp. 1162, 1166 (S.D.N.Y. 1970)). Although the SEC's approval is not binding on the Court, "the fact that the proxy material passed muster before the SEC–while not a ruling on the merits of the statements–is of some importance on the issue of injunctive relief." *McConnell,* 320 F. Supp. at 1166. "In an area where the primary power of protection of investors is vested in the Commission, their failure to take a stronger position is of

some weight, particularly on a motion of this sort for preliminary relief." *Sherman v. Posner,* 266 F. Supp. 871, 874 (S.D.N.Y. 1966).

Having considered in detail the evidence submitted by the parties, the Court finds that Plaintiff has not satisfied its burden of showing a likelihood of success on the merits of its omission or misrepresentation claim. While Plaintiff submits decisions in which the courts have found potential liability for a corporation's failure to disclose material facts in connection with a request for shareholder approval, Plaintiff's authorities state the general rules of disclosure without applying them to the specific kind of claim of omission at issue here. As the foregoing discussion reflects, there is certainly a duty of disclosure, but the scope of that duty is limited by the nature of the information, and courts have consistently rejected the imposition of a duty to disclose specific, detailed data underlying a fairness opinion.

Assuming, however, that such a duty existed, the Court finds the evidence shows that the Proxy contains sufficient detail to satisfy the duty to disclose. Contrary to Plaintiff's contention, the Proxy sets out the reserve data, the costs of production, and the anticipated production from the Assets. The Proxy sets forth four valuation scenarios addressed by Evercore and considered by the Special Committee and, ultimately, the Board. These scenarios underscore the inherent volatility of oil and gas prices. Significantly, one scenario – $90 per barrel of oil and $3 per MCF of gas– is almost exactly reflective of market prices as of July 27, 2012. *See* Affidavit of Plaintiff's proffered expert witness, Mary O'Connor.[6] Plaintiff's Ex. 1, ¶¶ 7-8. In this regard, the projections regarding

---

[6]Ms. O'Connor did not testify at the preliminary injunction hearing. Defendants suggest they would challenge the propriety of admitting her opinion as an expert witness pursuant to the requirements of Fed.R..Evid. 702 as determined by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596 (1993) and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999). At a minimum, they ask the Court to give her opinion slight weight because her credentials reflect she has no background in valuing oil and gas acquisitions
(continued...)

anticipated oil and gas prices in the future cannot, of course, be predicted with certainty. The same uncertainties associated with Wheatland's Assets also apply to Continental's own projections regarding the areas of production – the evidence shows that Continental already holds interests in the very same areas, and through this proposed transaction is simply acquiring more of what it already owns.  Indeed, Continental's experience in this particular area, and thus the experience of its shareholders by extension, militates all-the-more in favor of the sufficiency of the treatment of these topics in the Proxy.  Although additional, detailed disclosure may be helpful, it is simply not required under the circumstances present in this case.  Any shareholder can readily compare the four scenarios used by Evercore and disclosed in the Proxy with current oil and gas prices and historical fluctuations, and decide for himself whether the scenarios support the transaction.

Nor has Plaintiff sustained its burden with regard to its contention that the Proxy material is misleading or misrepresents the projected price of oil and gas from the Wheatland assets in the Bakken field.  Prior to the preliminary injunction hearing, counsel for Plaintiff filed a "declaration" [Doc. No. 67], and attached as an exhibit thereto material consisting of monthly crude oil price bulletins published by Rose Rock Midstream, L.P. ("Rose Rock") for the periods covering January, 2012 through August, 2012.[7]  The declaration states that the Rose Rock material evidences that the Proxy is misleading regarding the prices that may result from production from the Assets because

---

[6](...continued)
or in the industry in general.  While the Court has considered her opinion, she was not subject to cross-examination, and her opinion focuses primarily on general financial disclosures in proxy statements rather than on information material to the acquisition of oil and gas assets in a case of this type.

[7]Continental filed a motion [Doc. No. 70] asking the Court to strike the declaration as improperly submitted in violation of the Court's Order precluding the filing of a reply brief.  Continental also asserted the declaration constitutes  improper testimony by counsel of record and, as such, violates Rule 11.  At the hearing, the Court noted its concern that this type of declaration by a lawyer in the case is irregular; however, the Court declined to strike the filing or consider sanctions against Plaintiff's counsel.

it suggests the oil and gas sold from the Wheatland Assets are likely to command West Texas prices, while Rose Rock's material reflects the prices will be much lower.  Declaration at ¶ 3.

As Exhibit 7 to their brief opposing the preliminary injunction, Continental submits the affidavit of its Vice President of Crude Oil Marketing, Stephen G. Bradley, who is currently involved in the marketing of crude oil from the Bakken.  Bradley challenges the accuracy of counsel's declaration, noting the Proxy includes Evercore's four scenarios regarding various oil and gas prices that might be obtained, depending on future price fluctuations.  Proxy at p. 33.  Bradley also states that the price for oil produced  from Continental's assets in the Bakken, which are the same as those to be acquired from Wheatland, is based on the New York Mercantile Exchange's West Texas intermediate calendar on trade day average price.   Bradley aff., ¶¶ 7-8.  Bradley also notes that Continental and Wheatland have access to other benchmark pricing, and the posted prices listed by Rose Rock and cited in the declaration have no bearing on the price of Continental's, or Wheatland's, Bakken oil.  *Id.* at ¶¶ 8-9. Bradley further states that Continental does not sell oil or gas to Rose Rock. *Id.*

The Court does not find that counsel's declaration or the attached Rose Rock material provides sufficient evidence to warrant a conclusion that the Proxy's projections of potential oil and gas prices in a fluctuating market are misleading or misrepresent the facts to shareholders.  For the reasons discussed, *supra,* the shareholders of Continental possess sufficient information to assess the uncertainties associated with oil and gas prices which may be derived in the future from the acquisition of additional interests in an area in which Continental has been active for some time.

Similarly, the Court does not find persuasive Plaintiff's argument at the preliminary injunction hearing that Continental was required to disclose the details of arms-length acquisitions

from third parties prior to the proposed acquisition.  As Plaintiff concedes, the Proxy discloses that such acquisitions occurred.  However, Plaintiff contends that the details of these transactions must be disclosed.  Continental explained during the hearing that further details of the three referenced acquisitions were not disclosed because each was subject to a confidentiality agreement restricting Continental's disclosure regarding the transactions.    The Court finds Plaintiff has not met its burden of showing a likelihood of success on the merits of this contention, as it fails to show how the undefined details it seeks would significantly alter the total mix of information made available regarding the proposed acquisition.

Nor is there clear merit to Plaintiff's contention that the Proxy omits information regarding the projected costs of production of the Assets.   The Proxy contains historical data reflecting revenue versus costs for 2009 through 2011, and that data shows increasing costs.  Proxy at pp. 15, 33.  A shareholder can readily determine from that information that costs have exceeded revenues, and Plaintiff expressly does not contend that the Proxy contains false statements or is fraudulent in this regard.  Furthermore, as Continental points out, the details of costs analysis for the development of oil and gas in the Bakken field have been disclosed to Continental shareholders, including those asked to vote on the proposed Wheatland acquisition, in Continental's annual reports.  Continental's 2010 Annual Report, Continental hearing Exhibit 1, provides specific information regarding the reserves and costs incurred in the Bakken area.  Because the area proposed for acquisition is the same as that in which Continental already owns interests and has been operating for years, the information which Plaintiff seeks is readily available to it and the other Continental shareholders.

Plaintiff has failed to show how the additional details which it seeks would be material to a shareholder's decision regarding approval or disapproval of the proposed acquisition, as it has not

demonstrated that the alleged omitted particulars would significantly alter the total mix of information made available regarding the proposal, and thus has not demonstrated a likelihood of success on the merits.

2.  Irreparable harm:

Even if the Court were to find that Plaintiff has potentially demonstrated a likelihood of success on the merits, Plaintiff is required to show that it will suffer irreparable harm if the injunction does not issue.  For the following reasons, the Court concludes that Plaintiff has failed to do so.

Although the concept of irreparable harm is not easily defined, the movant must identify an injury that is "both certain, great, actual and not theoretical."  *See Heideman*, 348 F. 3d at 1189; *accord Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir.2001).  A movant "satisfies the irreparable harm requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'"  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir.2003)).  According to the Tenth Circuit, "a  showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,*  356 F. 3d 1256, 1260 (10th Cir. 2004)(citations omitted). "Regardless of the nature of the injury, the party seeking injunctive relief must show that 'the injury complained of [is] of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Pinson v. Pacheco,*  2010 WL 3911348, at *3 (10th Cir. Oct. 7,2010) (unpublished opinion) (quoting  *Heideman*, 348 F. 3d at 1189).

Irreparable harm *may* be established where corporate management denies shareholders the right to "vote their shares and to exercise their rightful control over the corporation." *Danaher Corp. v. Chicago Pneumatic Tool Co.,* 1986 WL 7001, at *14 (S.D.N.Y. June 19, 1986) (unpublished opinion) (citations omitted). However, in this case, Plaintiff's argument that it will be irreparably harmed if the August 10 shareholder vote is not enjoined rests on the assumption that the shareholders will approve the  acquisition. Of course, that result cannot be predicted with certainty at this point in time. In any event, Plaintiff's assertion of irreparable harm also rests  on the contention that the acquisition will be detrimental to the shareholders of Continental, an assertion that is not clearly supported by the evidence before the Court. Accordingly, any harm that Plaintiff contends would result from the failure to enjoin the vote is merely speculative and cannot support the extraordinary remedy of a preliminary injunction.

Furthermore, Plaintiff has failed to show why monetary damages will not be capable of remedying any harm that might result if it is ultimately determined Defendants breached their fiduciary duties and the shareholders were harmed as a result. As Plaintiff's counsel acknowledged during the previous TRO hearing, damages could be assessed against Hamm, Hume, or the other defendants if they improperly benefitted from the transaction to the detriment of Continental and its shareholders.   Plaintiff contends in this regard that some courts have expressed a preference for remedying such improper conduct before the transaction is implemented. *See ODS Technologies, L.P. v. Marshall*, 832 A. 2d 1254, 1262 (Del. Ch. 2003); *In re Staples, Inc. Shareholders Litigation,* 792 A.2d 934, 960 (Del. Ch. 2001). Although the courts in both cases expressed a preference for resolving a conflict via preliminary relief postponing the scheduled shareholder vote, nothing in these or other decisions cited by Plaintiff establishes a rule that preliminary relief is always required,

even if there is a showing of potential success on the merits.   In this case, the Court finds Plaintiff has not shown a likelihood of success on the merits or the existence of *irreparable* harm that will likely result from the August 10 vote.

Plaintiff also contends that it, along with other minority shareholders, will suffer harm if the transaction is allowed to proceed because their shares will be diluted.   However, as Defendants Hume, Hamm, and Wheatland argue, a mere dilution of stock does not constitute the type of irreparable injury required to support injunctive relief.   *Retirement Board of Allegheny County v. Rothblatt,* 2009 WL 3349262 (Del. Ch. 2009) (unpublished opinion).   Significantly, in this case, the proposed transaction will not impact corporate voting control because there is no contention that the acquisition will impact Hamm's majority shareholder status.   Where additional stock will not affect the voting control of the company, a claim that minority shares will be diluted does not support injunctive relief.   *Klein v. Panic,* 1986 WL 438 (Del. Ch. 1986) (unpublished opinion) ("Plaintiff argues that the dilutive effect of the additional outstanding stock would, of itself, constitute irreparable injury.   However, he cites no authority and the Court is aware of none, at least in these circumstances, where there is no claim that the additional stock will impact the voting control of the company.").

Similarly, in this case, Plaintiff offers no authority in which a court has found irreparable injury based on dilution of shares where the additional stock does not alter the majority control. Irreparable injury is not demonstrated on this basis.

21

3.  Balancing the harm to the movant and the nonmovant:

When balancing the equities among the parties, the Court must consider whether the threatened injury to the movant outweighs the potential harm to the defendants if the injunction is granted.  *See, e.g., Kikumura v. Hurley*, 242 F. 3d 950, 955 (10th Cir. 2001).

In the instant case, Continental argues that injunctive relief resulting in a delay of the August 10, 2012 shareholder vote would be harmful because the terms of the purchase agreement between Continental and Wheatland provide that either party has the right to terminate the agreement on or after August 15, 2012.  Therefore, if no vote occurs prior to that time, the transaction may not be consummated, and there is a risk of significant harm. In contrast, Plaintiff's assertion of harm if the vote occurs on August 10 is based on speculation that the shareholders will approve the proposal and, if so, that some sort of detriment will be suffered by the shareholders that cannot be remedied by monetary damages.

Even if this case is subject to the Tenth Circuit's relaxed standard regarding injunctive relief, the evidence before the Court establishes that the balance of harm does not tip *decidedly* in Plaintiff's favor.

At the preliminary injunction hearing, Defendants reiterated their argument that a delay of the August 10 vote to disclose additional information will be harmful because providing new information would require submission of a revised proxy statement to the SEC, and the SEC's review and approval could require several weeks.  In addition, Defendants argued that an additional delay would result from the need to publish and distribute to shareholders an amended or revised proxy statement, thereby possibly delaying the vote for up to two months.  Plaintiff challenged this

contention, and Plaintiff's counsel suggested the SEC would not require resubmission of the proxy for approval.

Plaintiff offered to provide supplemental authority to the Court supporting this contention. The Court authorized it to do so.  However, given the short time remaining before the scheduled vote, the Court directed Plaintiff to submit the material no later than 5:00 p.m. on August 8, 2012, and directed Defendants to respond no later than 6:00 p.m.  Any briefs to be submitted were limited to three pages.

In its supplemental material [Doc. No. 73], Plaintiff argues the SEC does not require preclearance of an amended proxy statement.  17 C. F. R.  § 240.14a-6(c).  In its response [Doc. No. 74], Continental concedes that SEC pre-approval would not be required, and acknowledges that its counsel was mistaken when he stated at the preliminary injunction hearing that SEC approval of amendments to the Proxy is required.  Continental notes that, although pre-approval was formerly required by the SEC, the requirement has been omitted.   Continental further argues, however, that additional time is required to provide shareholders with amended materials, proxy cards, and related information required by the SEC.  Continental estimates that, if it were required to provide the additional tables of information, which Plaintiff has suggested without specifying the requested contents, it would have to obtain the information from its petroleum engineering company, then prepare the materials, send the amendment to a printer, and then mail the materials and proxy cards to shareholders.  Continental estimates that printing and delivery would require about five days, and some time would be required to allow the shareholders to receive the amended materials.  As a result, it contends the August 15 deadline would necessarily expire before a vote could realistically take place.

Having considered the evidence of both parties, the Court concludes that Continental has shown a significant risk of harm if the vote does not take place on August 10.   Because Plaintiff has not shown a likelihood of success on the merits of its claims or that irreparable harm will result if the injunction does not issue, the Court finds the balance of harm weighs against issuing the injunction.

4.  Consideration of the public interest:

A party seeking a preliminary injunction is not required to show that the requested injunctive relief will serve the public interest; rather, it must show the issuance of the injunction would not be adverse to the public interest. *Heideman,* 348 F. 3d at 1188;  *Kikumura v. Hurley*, 242 F. 3d 950, 955 (10th Cir. 2001).

In this case, the parties do not focus extensively on this element of injunctive relief.  Plaintiff argues that ensuring shareholders have adequate information prior to approving a corporate proposal is in the public interest.  A similar argument can be made, however, that the public interest favors the ability of corporations and shareholders to govern their internal affairs without undue interference in advance of an expression of the will of all eligible shareholders through the voting of their shares.  This element does not tip in favor of Plaintiff.

For the foregoing reasons, the Court finds that Plaintiff has not satisfied its burden necessary to warrant issuance of a preliminary injunction on the basis that the Proxy omits or misstates material facts which render it misleading to the shareholders.   Accordingly, the motion [Doc. No. 51] is denied on this basis.

B. Request to enjoin Defendants from counting the Trusts' vote:

Having concluded Plaintiff has failed in satisfying its burden with respect to the requested injunction requiring additional disclosures prior to the scheduled vote, the Court must also consider Plaintiff's additional argument that, even if the August 10 vote is allowed to go forward, the Trusts' votes should not be included in the total minority shareholder vote.

In the absence of evidence that a trustee's vote is coerced or not independently cast, courts do not assume that trustees will act contrary to their fiduciary duties. *See, e.g., Berlin v. Emerald Partners,* 552 A. 2d 482 (Del. 1989). As the court in *Berlin* noted, "there is no legal basis to assume that the co-trustees would act contrary to their fiduciary duties." *Id.,* at 491. Plaintiff offers no persuasive legal authority to the contrary, but attempts to distinguish *Berlin* because it did not involve family members' trusts.

The Court concludes that, based on the limited legal authority available, there is no basis for assuming that Mackie will act, or vote the shares owned by the Trusts, contrary to his fiduciary duties. As discussed herein, *supra,* the Proxy discloses the existence of the Trusts and Mackie's role as co-trustee. It expressly discloses the number of shares held by the Trusts, and their percentage of the minority vote.

Furthermore, the evidence establishes that, contrary to Plaintiff's allegation, Mackie was not influenced by Hamm or anyone else in making the decision regarding the Trusts' vote. As discussed, *supra,* he did not talk with Hamm or Hume regarding the proposed Wheatland acquisition, and testified that Hamm has never told him how to vote the Trusts' shares. Moreover, the only communication he had with a Continental director was Monroe's inquiry regarding whether his vote on behalf of the Trusts would be independent. He confirmed that his vote would be independent, and that it has always been independent of Hamm. The fact that he was formerly

25

associated in business with Hamm and that he regards Hamm and Hume as personal friends does not, without more, establish a basis for concluding that his vote as a trustee is not independent.  *See, e.g., Beam ex. rel Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040, 1053-54 (Del. 2004) (close personal relationship, without more, does not result in determining a decision-maker has failed to make an independent decision).

As Defendants point out, the authorities submitted by Plaintiff do not support a contention that the Trusts should be regarded as affiliates of Hamm or under his control.  Absent some evidence that Mackie was controlled or influenced by Hamm in making a decision on behalf of the Trusts, the Court concludes that the evidence, consisting primarily of the deposition Plaintiff conducted prior to the preliminary injunction hearing, does not support its claim that the Trusts' votes should be excluded.   Plaintiff offers no reasonable basis for enjoining the August 10 vote or directing that the Trusts' votes be excluded.

III. Conclusion:

For the foregoing reasons, Plaintiff's motion for a preliminary injunction [Doc. No. 51] is DENIED.

IT IS SO ORDERED this 9th day of August, 2012.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE